```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------  X
                                                            :
RAMON HERNANDEZ,                                            :    **MEMORANDUM DECISION**
                                                            :    **AND ORDER**
                               Plaintiff,                   :
                                                            :    12 Civ. 234 (BMC)
             - against -                                    :
                                                            :
COCA COLA REFRESHMENTS USA, INC.,                           :
                                                            :
                               Defendant.                   :
----------------------------------------------------------  X
```

**COGAN**, District Judge.

Plaintiff Ramon Hernandez is one of sixteen plaintiffs who brought this employment discrimination action under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq*. ("CHRL"), in state court. Defendant removed the case to this Court on the basis of diversity jurisdiction.

Plaintiff began his employment with defendant in 1995, and in 2000 became a Transportation (Haulage) Driver, a position he held until his termination in 2009. He worked at defendant's bottling and distribution facility in Elmsford, New York. He alleges that on the basis of his Hispanic race, he was subjected to discrimination and a hostile work environment, and that he was terminated in retaliation for his complaints about his treatment. His termination was upheld by a neutral arbitrator pursuant to the collective bargaining agreement between his union and defendant.

Defendant has moved for summary judgment.[1] Because the facts are different as to each of plaintiff's claims, those facts relevant to each claim will be set forth below in the discussion of that claim. I have of course construed the record most favorably to plaintiff, see Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102 (2d Cir. 2013), except as to inadmissible evidence that he has offered, of which there is much. See ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007) ("[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment.").

I. CHRL

I reject plaintiff's effort to bring a claim under the CHRL. He did not work in New York City and there is no indication in the record that he had ever been there in connection with his work. He contends that the statute applies because *if* he would have been given the driving routes he wanted, those routes might have taken him through New York City. However, the law is clear that even if he had driven through New York City as part of his employment, he still could not assert a CHRL claim.

The CHRL requires that the "impact" of discrimination be felt in New York City. Germano v. Cornell Univ., No. 03 Civ. 9766, 2005 WL 2030355 (S.D.N.Y. Aug. 17, 2005) (holding although plaintiff was yelled at in New York City, the impact of discrimination was felt in Long Island, not New York City); see Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ.

---

[1] Because defendant moved for summary judgment as to all sixteen plaintiffs, each of whom, at first review, appeared to have disparate claims arising out of individualized circumstances, the record on defendant's motion was enormous and unmanageable. To make resolution more difficult, the parties' briefs cited only to their Local Rule 56.1 Statements, rather than to the evidence in support of the allegations in their Local Rule 56.1 Statements, a practice that courts have recognized makes it unduly difficult to examine the actual contents of the record. See e.g. Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812 (3d Cir. 2006); Skagen v. Sears, Roebuck & Co., 910 F.2d 1498 (7th Cir. 1990). I therefore directed the parties to resubmit those portions of their briefs and renumbered exhibits that pertain to this plaintiff only, and, further, to annotate the citations in their briefs so that they refer to the numeric designations on the exhibits themselves rather than only the Rule 56.1 Statements. In addition, I cautioned them because of the volume of this record, I would not go beyond their citations, as Rule 56(c)(3) provides.

2450, 1999 WL 796172 at *50, *51 (S.D.N.Y. Sept. 30, 1999) ("[t]he fact that certain acts . . . may occur in New York City will not necessarily give rise to a claim under the City HRL," because "even if the isolated incidents in New York City contributed to a hostile work environment, the plaintiffs' work environment is in Elmsford, New York, not New York City"). Moreover, the CHRL's applicability is supposed to be "simple" for courts to determine. See Hoffman v. Parade Publ'ns., 15 N.Y.3d 285, 291, 933 N.E.2d 744, 747 (2010); Fried v. LVI Servs., No. 10 Civ. 9308, 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011), aff'd, 500 F. App'x 39 (2d Cir. 2012) (stating that the Hoffman court's goals are simplicity and predictability, not "a fact-intensive analysis of the amount of contact a particular individual maintained with New York City" when it is undisputed plaintiff did not work there). Here, plaintiff neither worked nor felt the impact of the alleged discrimination in New York City.

Finally, plaintiff reliance on Rylott-Rooney v. Alitalia-Linee Aeree Italiane-Societa Per Azioni, 549 F. Supp. 2d 549 (S.D.N.Y. 2008), is misplaced. In that case, the plaintiff, who worked in Minnesota, was wrongfully terminated by her supervisor while both were in New York City. As far as the record discloses, plaintiff never even entered New York City as part of his employment.

## II. Discrimination Claims

Plaintiff's discrimination claims under the SHRL are analyzed the same way they would be analyzed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (2006). See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011). This is the familiar test under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

3

Plaintiff alleges two discrete acts of discrimination: (1) his termination was based on his race; (2) defendant used outside contractors and white employee drivers for some haulage work instead of minority drivers.

To make out a *prima facie* case on either of these claims, plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for this job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010). The burden of making this showing is *de minimis*. See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). Defendant concedes the first three criteria for purposes of this motion; the issue is whether plaintiff has introduced sufficient admissible evidence as to the fourth.

Turning to plaintiff's most important claim – termination on the basis of race – I note that in neither of the parties' briefs, nor in plaintiff's affidavit or deposition (and least in the excerpts to which I have been directed) are the circumstances surrounding plaintiff's termination explained; they are merely alluded to. The best recitation of the parties' versions of the events is in the arbitrator's decision upholding plaintiff's termination. There, it is described that plaintiff was an Alternate Shop Steward for his union. In addition, because he was computer literate, defendant had designated him to act as a dispatcher when specifically delegated that responsibility. One day, a fellow employee approached plaintiff in his capacity as shop steward to register a grievance over a route assignment. Plaintiff decided to investigate, and since he had limited access to defendant's computer system, he went into the dispatch office to use the computer to access the relevant route assignment information. He was caught, and was

4

terminated based on his unauthorized use of the computer and his removal of company records that he had printed out.

At the arbitration hearing, plaintiff contended that he had asked for and received permission to access the computer from the dispatcher, but that when she returned from a break, she acted like she had not authorized him and told him to leave. Plaintiff testified that he left and "accidentally" took some documents he had downloaded with him. Plaintiff further contended that since his union's collective bargaining agreement allowed him, as Alternate Shop Steward, the right to "investigate" grievances, he had the implicit right to access defendant's computer system. The arbitrator rejected plaintiff's testimony as "disingenuous," crediting, instead, the testimony of the dispatcher, who testified that she was not even in the room when plaintiff accessed her computer; that he had argued with her when she found him and told him to leave; and that she would never have granted him such access because she did not have that authority. As noted above, the arbitrator upheld the termination.

What does this have to do with racial discrimination? The answer appears in one sentence in plaintiff's brief in opposition to defendant's summary judgment motion: "Shockingly, just a week prior, white driver Paul Mongelli printed out dispatch records from the same computer without permission and was not disciplined, yet Mr. Hernandez was terminated." It is therefore, apparently, plaintiff's contention that since he was terminated and a white driver was not, although they had engaged in the same misconduct, his termination must have been based on racial discrimination.

Even if the fact of inconsistent discipline between plaintiff and one white driver were sufficient to satisfy plaintiff's minimal burden in making out a *prima facie* case, he would still have to support it with some admissible evidence. He has not, at least not any to which he has

cited me. He has cited me to the arbitrator's decision, which does not mention Mongelli or white drivers at all (consistent with plaintiff's assertion that he did not know he could assert his discrimination claim at the arbitration hearing). He has cited me to pages 79:8-80:4 of his deposition, which also do not mention white drivers or Mongelli.[2] He has cited me to paragraph 26 of his affidavit in opposition to defendant's motion, which says, "I believe Arbitrator Herzong's [sic] Opinion and Award are incorrect and not in accordance with the CBA." And he has cited me to certain allegations in his complaint, but it is of course fundamental that allegations in a complaint are not "evidence" that can defeat a motion for summary judgment. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) ("[L]itigants should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion 'may not rest upon the mere allegations or denials' of the party's pleading and that if the party does not respond properly, 'summary judgment, if appropriate, shall be entered' against him.") (quoting Fed. R. Civ. P. 56(e)).[3]

In examining the claims of other plaintiffs in this action, I have repeatedly reminded plaintiff's attorney of two fundamental federal practice points. First, as it plainly says in Fed. R. Civ. P. 56, a party can oppose summary judgment only with admissible evidence, which excludes hearsay, conclusions, and unsupported allegations in a complaint. Second, a district court is not obligated to hunt through a record, especially a voluminous record like I have here, to find buried gems that might save a party's case. This is because Federal Rule of Civil Procedure 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." Amnesty Am. v. Town of W. Hartford,

---

[2] Indeed, it is only in defendants' reply brief that I have been cited to any mention of Mongelli in plaintiff's deposition, and that fleeting reference is not nearly enough to state a *prima facie* case.

[3] Defendant seems strangely unaware that allegations in a complaint cannot be used to oppose summary judgment, as it has responded to those allegations as if they were substantive evidence.

6

288 F.3d 467, 470 (2d Cir. 2002). Rather, under Rule 56(c)(3), a district court is obligated only to consider the materials cited by the parties. Having reviewed each of the citations to which plaintiff's attorney has directed me and finding no proof of this alleged Mongelli comparable, I must conclude that plaintiff has failed to show a *prima facie* case with regard to his claim of discriminatory termination.

Plaintiff's claim that defendant gave white drivers and outside contractors more hours at minority drivers' expense suffers from a similar dearth of admissible evidence. As support for his claim, plaintiff has cited me to several places in the record. First, he cites to the affidavit of David Prestipino, a Manager for defendant, who asserts that defendant "has never utilized outside carriers for runs while Union Drivers were on layoff." But there's nothing controversial about that. It is undisputed that the CBA only prohibits outside contractors when defendant has furloughed company drivers. Nothing in the CBA prevents defendant from trying to save overtime or avoid extra pay by using outside contractors during non-layoff periods. Moreover, Prestipino's cited statement has nothing to do with assigning work to white as opposed to minority drivers during such periods.

In terms of favoring white employee drivers, plaintiff has offered only his own impressionistic deposition testimony that he and the minority drivers he knew witnessed the use of outside contractors even when he was told there was no work for him, and that he has not seen a white driver denied work in such circumstances. He does not know whether assignments were made to white drivers under these conditions – just that he has not personally seen a *denial* of such assignments. His attorney apparently chose to take no discovery that might have substantiated such a disparity, or if he did, that discovery did not confirm plaintiff's speculation. Plaintiff's impression of work assignments is no substitute for evidence of the assignments that

actually were made. His "summing up" of the assignment process as he perceives it reflects a conclusion; it cannot raise an issue of fact.

**III.     Hostile Work Environment Claims**

In order to raise an issue of fact as to a claim of hostile work environment under the SHRL, plaintiff must adduce facts showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's work environment." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003). Again, the analytical framework for this test is the same under Title VII and the SHRL. See Van Zant v. KLM Royal Dutch Airways, 80 F.3d 708 (2d Cir. 1996).

I have looked at what plaintiff contends constitutes a hostile work environment as set forth in his brief, and it is again long on argument but short on evidence. First, plaintiff's brief asserts that "[i]n 2009, he witnessed white supervisor Aemisegeo display violent behavior in front of minority drivers in an attempt to intimidate them. Mr. Aemisegeo did not display this behavior in front of white drivers." The record citations in support of these statements (putting aside the citations to the complaint, for the reason stated above) fall well short of substantiating them. The only citation is to plaintiff's deposition, which discloses the following:

> Q:  Ok. But you don't know whether he was violent at other times when you were have there, but someone else may have been there, correct?
> A:  Anything is possible. If I wasn't there, I can't testify to that.
> Q:  It could have been while a white driver was there, correct?
> A:  He could have gotten violent on a supermarket. I don't know. If I wasn't there, I can't tell you if he did or not.
> Q: What was he getting violent about?
> A:  Joe – Joe Aemisegeo, he's not […]

The excerpt that plaintiff has submitted ends there – I have been cited to nothing in the record describing what Aemisegeo did. The most I can infer from this record, giving plaintiff every benefit of the doubt as a party opposing a summary judgment motion, is that there was some incident involving Aemisegeo. But I have not been told what it was.

Moreover, plaintiff himself acknowledges in his deposition testimony that he has no knowledge whether Aemisegeo had a similar episode (whatever it was) with any white drivers. All plaintiff can say is that he, plaintiff, did not observe it. "If I wasn't there, I can't tell you if he did or not." Or, as plaintiff testified in another portion of his deposition to which he has directed me, when asked about how some employee (I assume Aemisegeo, but I have not been told) acted around white drivers, "I don't know if he did mud wrestling or whatever with them. I wasn't there." The truncated description of an incident that plaintiff has placed in the record before me has no probative value on the issue of whether plaintiff suffered from a racially hostile work environment.

The rest of plaintiff's evidence of a racially hostile work environment consists of a few scattered remarks that he overheard or that were reported to him by co-workers. The speaker of most of these remarks was a supervisor named Larry Maloney, who defendant fired in 2007, five years before the commencement of this action. Plaintiff alleges that he heard Maloney use a racial epithet and a racial insult against an African-American worker on one occasion and that he heard Maloney ask Hispanic workers if they were homosexuals.[4] Plaintiff also asserts that a co-worker, Will Nunez, advised him that Maloney had made a negative remark about Hispanics having lots of children and Maloney had said that Nunez "looked like a thug from the street."

---

[4] As to this latter remark, plaintiff's brief asserts that it happened "frequently" but plaintiff's testimony does not indicate whether this was a single remark or if not, how often it occurred.

The statute of limitations for hostile work environment claims brought under the SHRL and NYCHRL is three years. N.Y. C.P.L.R. § 214(2). Since Maloney's misconduct occurred well beyond this period (this action was commenced in January, 2012), plaintiff summarily asserts that the "continuing violating doctrine" ties Maloney's misconduct to more recent indicia of plaintiff's racially hostile work environment. However, the continuing violation doctrine applies "to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists or discriminatory employment tests," Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993) (citations omitted), abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp., 131 S. Ct. 1325 (2011), or "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994). Further, "the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." Trinidad v. New York City Dep't of Correction, 04 Civ. 03261(RJH), 2006 WL 704163 at *9, n. 11 (S.D.N.Y. Mar. 21, 2006).

To determine whether the continuing violation doctrine might apply, I need to look for some relationship between the hostile acts that fall without the statute and those that fall within it. Even in the context of a hostile work environment claim, the Second Circuit has declined to apply the continuing violation doctrine to hostile acts outside the limitations period that are "qualitatively different" from those within it. Fitzgerald v. Henderson, 251 F.3d 345, 364–65 (2d Cir. 2001). Here, as to matters outside the three year period, in addition to the Maloney comments, plaintiff alleges that in 2006, Nunez told him that a white Transportation Supervisor, Gabino Roche, had referred to Nunez by a racial epithet. As to any evidence of hostility that

10

falls within the statute, plaintiff points only to the Aemisageo incident that I have described above (to the extent the limited evidentiary record allows me to describe it).

In addition to these alleged acts of hostility by supervisors, plaintiff also includes some comments by co-workers. They all pre-date the three year period. The first occurred in 2008, when a co-worker named Chris Suarez directed a racial epithet at plaintiff. Plaintiff reported it, and after a brief suspension of Suarez for investigation, defendant fired Suarez. One would think that plaintiff could not complain about that prompt and effective response. Nevertheless, plaintiff considers it an indicator of his hostile environment that his supervisor, Aemisegeo, attempted to persuade plaintiff to ask Human Resources not to fire Suarez over the incident, and when plaintiff refused, Aemisegeo gave plaintiff the cold shoulder (more specifically, he would convey directions to plaintiff through others instead of directly as he had in the past).

Plaintiff also relies on information he received from co-workers in 2008, who he does not identify (i.e., "Co-workers told me that …"), that one other co-worker had used a racial epithet directed at another co-worker, and that yet another co-worker had made a disparaging racial remark against President Obama.

Finally, plaintiff points to a memorandum in 2008 written by Roche, the Transportation Supervisor, which plaintiff characterizes as reflecting that Roche "wanted to reign in the hours of minority drivers." First, it doesn't say that at all. The memorandum, which was written by Roche to others who plaintiff has largely left unidentified, but who appear to be other supervisors, states:

> Please, let's make something perfectly clear. Elmsford gets four loads of pallets first, then a load can be sent to Maspeth. It does not matter where the pallets come from, Elmsford gets four first. We ran out of pallets last night. Thank you.

11

> Ortiz, Pennicooke, Perrin, and Chisholm – Please, remember these four names when it comes to keeping hours under control. Keep ALL four to 8 hours today, even though we are working 10 hours today. They must be pulled back because they have been getting between 10 and 12 hours daily. Thanks.

The memorandum went on at considerable length to discuss a number of other business issues. It is thus hardly a smoking gun indicative of a hostile work environment. It simply says that certain drivers have been getting too much overtime and need to be cut back. I will assume that the referenced drivers are all members of minority groups, but plaintiff has offered no admissible evidence that there were white drivers with comparable hours who were not cut back. Moreover, plaintiff has cited me to nothing that would indicate he even knew of this memorandum until this litigation, and without such evidence, it could not have contributed to his alleged hostile work environment.

Thus, the only potential "anchor" for a timely hostile work environment claim is the vaguely described Aemisegeo yelling incident in 2009. Putting aside the lack of information about that incident in the record (at least as plaintiff has cited it to me), there is no connection between it and any of the other incidents that plaintiff has described. For the continuing violation doctrine to apply, there must be an environment that "continues." There is nothing continuing here. There is just, at most, a handful of inappropriate, vulgar, loading-dock remarks, occurring over a lengthy period, each instance of which is disconnected from any other. Other than the 2009 Aemisegeo yelling incident, the hostile work environment claim is time-barred.

But even if there was no time-bar, or to an even greater extent, viewing the Aemisegeo incident alone, plaintiff has shown nothing that "permeated" his environment "with discriminatory intimidation, ridicule, and insult" that was so "severe or pervasive to [as to] alter the conditions of the victim's work environment." Mack, 326 F.3d at 122 (2d Cir. 2003). Suarez

made a racial remark against plaintiff and was fired for it. Maloney allegedly made such remarks but he was fired too. Over the course of fourteen years' employment, the few disconnected incidents of coarseness to which plaintiff refers comes nowhere near the standard for a hostile work environment.

## IV.     Retaliation

I evaluate a SHRL retaliation claim under the same three-step, burden-shifting framework used for an adverse employment claim as established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). First, a plaintiff must establish a prima facie case of retaliation by demonstrating that (1) "he engaged in protected participation or opposition under Title VII . . . (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester Cnty. Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citations omitted). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory, reason for the employment action, and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. See Sista v. CDC Ixis North America, Inc., 445 F.3d 161 (2d Cir. 2006).

In his brief, plaintiff argues that defendant took two retaliatory actions against him as a result of protected activity: (1) he was less frequently assigned his preferred job as a dispatcher; and (2) he was terminated.[5]

Let us first look at the alleged protected activity. Plaintiff offers two actions he took that he believes qualify. First, he complained to defendant's Human Resources department that his co-worker Suarez had used a racial epithet against him. That is plainly protected activity. Second, he alleges that he complained that defendant's system for allowing employees to pick their vacation slots worked to the disadvantage of minority employees. As to this claim, plaintiff has distorted the record. He made no such complaint. He was forced to concede at his deposition, when defendant's counsel played him an audiotape of his complaint (which I have not been given), that his complaint about vacation was that junior workers were disadvantaged, not minority workers: "The way that they were doing it in my complaint was that the way the vacations were being picked was something that was detrimental to the junior guys." His affidavit confirms this: "In my conversation with Ms. Cathy Klavel [I believe this is someone in defendant's Human Resources Department], I implied that the vacation pick system was unfair to Junior Employees." In essence, plaintiff was protesting the seniority preference for vacation planning. It had nothing to do with race, and it was not protected activity.

Let us next look at the adverse action that plaintiff claims resulted from his having engaged in protected activity. He was fired. That is adverse under any definition. But "less frequent assignments" as a dispatcher, on this record, are not. First, although plaintiff makes a conclusory assertion in his affidavit that his supervisors knew that he preferred dispatch work, he

---

[5] Defendant's reply brief, on this point and perhaps one or two others, suggests that plaintiff may be advancing additional arguments besides those in his brief, perhaps in his complaint or his Local Rule 56.1 statement. For the reasons set forth above, I have confined my review to the parties' briefs and those portions of the record to which they have directed me.

14

does not say how they knew that. I have not been cited to any part of the record where he asserts that he told his employer of such a preference. Second, the record is undisputed that there was no extra salary in dispatch work; it paid at the same rate as plaintiff's usual labor. Both dispatch work and driving were within plaintiff's job description and there is no claim that he was given work outside his job description after his complaint against Suarez. Third, the argument in plaintiff's brief that plaintiff preferred dispatch work, let alone that his supervisors knew of any such preference, is contradicted by his deposition testimony:

> Q: Did you want to do dispatch work?
> A: It didn't matter to me one way or the other.

In order for an action to support a retaliation claim, it must be considered "materially adverse." See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006). An action is materially adverse if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. Although this test is objective, see Millea v. Metro-North R.R. Co., 658 F.3d 154 (2d Cir. 2011), plaintiff's acknowledgement that he did not consider dispatch work to be of any importance, coupled with the absence of any reason why some other reasonable person would think otherwise, compels the conclusion that any alleged decrease in dispatch work was not a material adverse action.

We are therefore left with protected activity consisting of plaintiff's complaint against Suarez, and his termination as the alleged material adverse action for that. Even assuming that these facts alone are sufficient to state a *prima facie* case of retaliation, defendant easily satisfies the second prong of the McDonnell Douglas test by producing evidence that plaintiff was fired for the unauthorized, unsupervised access to defendant's proprietary computer system. Having done so, the rebuttable presumption that plaintiff obtained through his *prima facie* case "simply

drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). The remaining question is whether plaintiff can raise a factual issue upon which a reasonable jury could find that defendant's proffered justification for his termination was pretextual, or that there is other evidence from which a jury could reasonably reach a conclusion of retaliatory motivation.

Plaintiff points out that under Collins v. New York City Transit Authority, 305 F.3d 113 (2d Cir. 2002), the fact that he failed to prevail in arbitration does not preclude his claim. He is correct, but his argument ignores the Circuit's conclusion in Collins that when a termination occurs "only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination," then "[t]his fact is highly probative of the absence of discriminatory intent in the termination." Id. at 119. As the Circuit held:

> Where . . . that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact – e.g., new evidence not before the tribunal – or that the impartiality of the proceeding was somehow compromised."

Id. Here, the a neutral arbitrator appointed pursuant to a grievance process in a collective bargaining agreement heard evidence, determined credibility, and rendered a lengthy, reasoned decision.[6]

Against this highly probative evidence, plaintiff offers nothing other than the fact of his membership in a minority group. That is not sufficient, for all of the other evidence in the record

---

[6] I note that the Circuit decided Collins in the context of the fourth prong for a plaintiff's *prima facie* case, rather than as part of considering the third step of McDonnell-Douglas, as I am using it here. As Collins noted, these two issues "tend to collapse as a practical matter under the McDonnell Douglas framework." Collins, 305 F.3d at 118 n.1. Arguably, Collins' rationale fits better in the third McDonnell-Douglas step because in testing a plaintiff's *prima facie* case, the Court is generally confined to the evidence that the plaintiff offers, see Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000), and a plaintiff will rarely offer an adverse arbitration decision as part of his *prima facie* case.

16

tends to show an absence of causation between plaintiff's protected activity and his termination. Plaintiff points out that he was terminated "only" a year after his report on Suarez, but a year is quite a long time in linking protected activity with a material adverse event, too long in most cases. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 121 S. Ct. 1508 (2001). Courts in this Circuit have varied widely as to the length of time between the protected activity and the adverse action that is sufficient to break the chain of causation as a matter of law. See Gorman–Bakos v. Cornell Co-op. Extension of Schenectady Cnty., 252 F.3d 545 (2d Cir. 2001). The Second Circuit has not laid down a bright-line rule, leaving it to the district courts to determine on a case-by-case basis based on all of the facts, see id., but it is the rare case that finds an issue of fact as to causation when nearly a year rather than months have gone by. Retaliatory intent does not sit patiently like a spider in a web hoping that prey will wander in; the daily employment relationship provides for constant opportunities and temptations to retaliate for protected activity if an employer is of a mind to do so.

The paucity of evidence that plaintiff has offered compounds plaintiff's problem – I have not even been told which personnel were involved in the decision to discipline him after he accessed the company computer system. Although a corporation is the defendant here, corporations can only have such motives as are imputed to them through their managers. Plaintiff has not told me who was out to "get him" here. It was certainly not the dispatcher, a non-management employee, who supplied the key testimony against him at the arbitration hearing, namely that plaintiff was dissembling when he claimed that she had given him permission to access the computer system. It was presumably not someone in the Human Resources department, which made the decision to terminate or at least administratively implement the termination. Perhaps it was Aemisegeo, who plaintiff claims shunned him after

plaintiff complained about Suarez; or perhaps it was Roche, who, it appears from the arbitration decision, first confronted plaintiff about his unauthorized access when the dispatcher told Roche about it. Whoever it was, plaintiff has not told me. And I cannot ask a jury to speculate about an illegal motivation when the decision of a neutral arbitrator, rendered after taking live testimony at a hearing where plaintiff was represented by counsel, finds as a fact that there was a perfectly proper motivation for the termination, and plaintiff has offered no evidence at all to the contrary.[7]

## CONCLUSION

Defendant's motion for summary judgment as to the claims of Ramon Hernandez is granted.

**SO ORDERED.**

                                                    U.S.D.J.

Dated: Brooklyn, New York
       Dec. 6, 2013

---

[7] Plaintiff has complaints about the way his union-appointed lawyer handled his representation at the arbitration hearing, particularly in failing to advise him that he could have asserted his discriminatory retaliation claim, but that is of no moment in this action. See Rommage v. MTA Long Island R.R., No. 08 cv 836, 2010 WL 4038754, at *12 (E.D.N.Y. Sept. 30, 2010) (plaintiff's contention that the arbitration decision was not entitled to weight "because it did not consider any evidence of discrimination . . . has been rejected by courts in this Circuit.") (collecting cases); Gallimore–Wright v. Long Island R.R. Co., 354 F. Supp. 2d 478, 491-92 (S.D.N.Y. 2005) ("There is no suggestion in Collins that the plaintiff had presented his evidence of discriminatory and retaliatory intent to the arbitrator. Certainly the Circuit did not rely on any findings by the arbitrator with respect to any such claims. And this makes good sense in light of what the Circuit did say. Its point was that the arbitration decision finding that the plaintiff . . . was properly terminated was strong evidence of a lack of retaliatory or discriminatory intent which, in the absence of any meaningful proof to the contrary, prevented the plaintiff from making out a *prima facie* case.").

Plaintiff also complains that although he testified at the hearing, he was not allowed to call certain witnesses. The record is unclear as to whose decision this was, or what testimony the witnesses would have given, and, as has been typical in this case, the parties have not explained it in their briefs. It appears from his deposition that plaintiff wanted to call certain witnesses to testify about the training regimen that those employees received. Plaintiff has not explained how that would have been significant to the accusation that he breached a secure computer system.