UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                            :

KISHIA BRIGHT, GUILLERMO NUNEZ,     :
ISAAC OLABANJO, JOHNNY SMALL,       :       **MEMORANDUM DECISION AND**
DAVE VILCEUS, SANDRA WALKER, and   :       **ORDER**
DIANE WORRELL,                          :
                     Plaintiffs,      :       12 Civ. 234 (BMC)
                                              :
            - against -             :
                                              :

COCA COLA REFRESHEMENTS USA,     :
INC.,                                           :
                                              :
                     Defendant.

-------------------------------------------------------- X

**COGAN**, **District Judge**.

         Plaintiffs Kishia Bright, Guillermo Nunez, Isaac Olabanjo, Johnny Small, Dave Vilceus,

Sandra Walker, and Diane Worrell are among the sixteen plaintiffs who brought this

employment discrimination action under the New York State Human Rights Law, N.Y. Exec.

Law § 290 *et seq.* ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code

§ 8-101 *et. seq.* ("CHRL"), in state court on January 3, 2012.  Defendant removed the case to this

Court on the basis of diversity jurisdiction.  The claims of the other nine plaintiffs have been

dismissed either by stipulation or grant of summary judgment to defendant.

         Defendant has moved for summary judgment to dismiss the remaining plaintiffs' claims.

The facts relevant to each plaintiff's claim will be set forth in the discussion of that claim.  I have

of course construed the record most favorably for each plaintiff, see Mihalik v. Credit Agricole

Cheuvreux North America, Inc., 715 F.3d 102, 108 (2d Cir. 2013), except as to the inadmissible

evidence that each has offered.  See ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir.

2007) ("[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment.").

## GOVERNING LAW

### I.    Racial Discrimination

Discrimination claims under the SHRL are analyzed the same way they would be analyzed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (2006).  See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011).  This is the familiar test under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  To make out a *prima facie* case, a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. See Adams v. City of N.Y., 837 F. Supp. 2d 108, 119-120 (E.D.N.Y. 2011).

The plaintiff's burden of making this showing is *de minimis*.  See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006).  An applicant is qualified for a position if he meets the specific criteria required by his employer.  See Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997).  A plaintiff endures an adverse employment action whenever "he or she endures a materially adverse change in the terms and conditions of employment . . . which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  Joseph, 465 F.3d at 90 (quotations and citations omitted).  An inference of discrimination arises if "the employer treated plaintiff less favorably than a similarly situated employee outside his protected group." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003).

If a plaintiff makes his or her *prima facie* case, the burden shifts to the defendant to provide a non-discriminatory reason for its actions against the plaintiff.  See Weinstock v.

<u>Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000).  If such a reason is articulated, the burden shifts

back to the plaintiff, who must produce sufficient evidence for a reasonable fact-finder to believe

that the defendant's proffered reason is mere pretext for actual discrimination.  <u>Id.</u>

A discrimination claim under the CHRL must be reviewed independently and more

liberally than its federal and state counterparts.  <u>See</u> <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582

F.3d 268, 278 (2d Cir. 2009).  The city statute does not require an adverse employment action; a

plaintiff must only provide evidence he or she was treated "less well" than other employees

based on his or her protected status.  <u>See</u> <u>Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.</u>, 866 F.

Supp. 2d 147, 160 (E.D.N.Y. 2011).  However, a moving defendant is entitled to summary

judgment if it can show, as an affirmative defense, that a reasonable jury could not interpret the

alleged discrimination as anything more than "petty slights or trivial inconveniences."  <u>Mihalik</u>,

715 F.3d at 114.

"[A] plaintiff's discrimination claims under . . . the NYCHRL are subject to the burden-

shifting analysis applied to discrimination claims under Title VII."  <u>Spiegel v. Schulmann</u>, 604

F.3d 72, 80 (2d Cir. 2010).

## II.    Hostile Work Environment

To prevail on a hostile work environment claim under the SHRL, a plaintiff must provide

evidence "(1) that the workplace was permeated with discriminatory intimidation that was

sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2)

that a specific basis exists for imputing the conduct that created the hostile environment to the

employer."  <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 122 (2d Cir. 2003), <u>abrogated on other</u>

<u>grounds by</u> <u>Vance v. Ball State Univ.</u>, __ U.S. __, 133 S. Ct. 2434 (2013).  The analytical

framework for this test is the same under Title VII and the SHRL. Van Zant v. KLM Royal Dutch Airways, 80 F.3d 708, 714 (2d Cir. 1996).

Under the CHRL's more liberal standard, a plaintiff must "show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons." Fenner v. News Corp., No. 09 Civ. 09832, 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013); see also Mihalik, 715 F.3d at 114. A claim under CHRL should be dismissed if the plaintiff does not allege behavior by the defendant that "cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other." Hernandez v. Kaisman, 103 A.D.3d 106, 114-15, 957 N.Y.S.2d 53 (1st Dep't 2012) (quotations and citations omitted).

A plaintiff may support a hostile work environment claim with incidents that he or she did not personally witness or hear. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71 (2d Cir. 2000). However, "statements reported to the plaintiffs and not supported by affidavits [may be] inadmissible hearsay." Id. at 71; see also Howley v. Town of Stratford, 217 F.3d 141, 154-55 (2d Cir. 2000) (finding that plaintiff's testimony that other coworkers told her of certain harassing statements by supervisor likely inadmissible to prove that the statements were made, although the testimony of those coworkers might be admissible).

## III.    Retaliation

Retaliation claims under the SHRL are also analyzed under the three-step, burden-shifting McDonnell Douglas framework. See 411 U.S. 792, 93 S. Ct. 1817. A plaintiff must first establish a *prima facie* case of retaliation by demonstrating that "(1) he engaged in protected participation or opposition under Title VII . . . (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection

exists between the protected activity and the adverse action." <u>Kessler v. Westchester Cnty. Dep't of Social Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006) (citations omitted).

In determining whether a plaintiff has satisfied this initial burden, the Court's role in evaluating a summary judgment motion is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff satisfies his burden, the defendant must articulate a legitimate, non-retaliatory reason for the employment action, and if it does the burden shifts back to the plaintiff to demonstrate by competent evidence that the reason proffered by the defendant was pretext for a retaliatory animus based upon the protected activity. <u>See</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 173 (2d Cir. 2006).

To support a retaliation claim under the SHRL, an action must be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006) (quotations and citations omitted). Such a determination is objective. <u>Millea v. Metro N. R.R. Co.</u>, 658 F.3d 154, 165 (2d Cir. 2011) (quoting <u>Burlington</u>, 548 U.S. at 68). This standard is intended to distinguish "significant from trivial harms" to ensure that statutes such as the SHRL do not create "a general civility code for the American workplace." <u>Id.</u> Pursuant to <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517 (2013), retaliation must be a "but-for" cause of the adverse action, but not necessarily the only cause. A plaintiff needs to prove "only that the adverse action would not have occurred in the absence of the retaliatory motive." <u>Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 845-46 (2d Cir. 2013).

Under the CHRL, the same burden-shifting approach applies, but the employer's conduct need not be a materially adverse action; it only needs to be "reasonably likely to deter a person

from engaging in protected activity." <u>Sotomayor v. City of New York</u>, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), <u>aff'd</u>, 713 F.3d 163 (2d Cir. 2013) (quotations and citations omitted).

## IV.    Statute of Limitations

The statute of limitations for both the SHRL and CHRL is three years from the date the claim accrued. <u>See</u> N.Y. Exec. Law § 296; N.Y.C. Admin. Code § 8-502(d).  As noted, this case was filed on January 3, 2012; therefore, claims that accrued before January 3, 2009 will be barred by the statute of limitations absent an applicable exception.  The relevant exception for present purposes is the continuing violation doctrine.

 "The continuing-violation exception 'extends the limitations period for all claims of discriminatory acts committed under [an ongoing policy of discrimination] even if those acts, standing alone, would have been barred by the statute of limitations.'" <u>Annis v. County of Westchester</u>, 136 F.3d 239, 245-46 (2d Cir. 1998).  "[T]he continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." <u>Trinidad v. New York City Dept. of Correction</u>, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (quotations omitted).

It is well-established that the "continuing violation" doctrine cannot save untimely claims for discrete discriminatory acts, even where those discrete acts are related to acts within the limitations period – "termination, failure to promote, denial of transfer, or refusal to hire" are prototypical examples. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114, 122 S. Ct. 2061 (2002).  Even for a hostile work environment claim, a plaintiff must show both that an incident of harassment occurred within the limitations period, and that this timely incident was "part of the same actionable hostile work environment practice" as the untimely incidents. <u>See</u> <u>McGullam v. Cedar Graphics</u>, 609 F.3d 70, 76 (2d Cir. 2010).  The inquiry into whether timely

and untimely acts are sufficiently related to invoke the continuing violation doctrine is flexible and fact-specific. See id. Incidents that involve different perpetrators, actions, or targets, or are temporally distant from one another, may be insufficiently related. See id. at 78. Conversely, sufficient "relatedness" may be found where the timely and untimely incidents involve "the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Morgan, 536 U.S. at 120-21.

"New York courts have held that the pre-Morgan, more generous continuing violations doctrine continues to apply to discrete acts of employment discrimination under NYCHRL." Dimitracopoulos v. City of New York, No. 14 Civ. 674, 2014 WL 2547586, at *7 (E.D.N.Y. June 4, 2014) (citing Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 35 (1st Dep't 2009)). But although "[t]ime-barred discrete acts can be considered timely," a plaintiff must still show that "specific and related instances of discrimination [were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." Dimitracopoulos, 2014 WL 2547586, at *7 (quoting Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)). For example, discrete discriminatory acts perpetrated by different individuals may still be insufficient to invoke the continuing violation doctrine even under the more liberal CHRL standard. Dimitracopoulos, 2014 WL 2547586, at *7-8.

Nearly all of the plaintiffs in this action bring at least some claims that are, on their face, time-barred, and plaintiffs therefore invoke the "continuing violation" doctrine to attempt to save their time-barred claims.[1]

---

[1] Plaintiffs' approach to doing so was of no assistance to the Court. Tthey describe the continuing violation doctrine in general terms at the beginning of their brief, but rather than apply this doctrine to the facts relevant to each plaintiff, plaintiffs simply state that, for example, a particular plaintiff's "hostile work environment claims are all timely pursuant to the aforementioned continuing violation doctrine." An argument is unpersuasive when it is no argument at all.

## DISCUSSION

At the outset, I note a problem that pervades the entirety of plaintiffs' opposition to summary judgment.  Each of the plaintiffs in this action was deposed.  Each of the plaintiffs was asked, at their deposition, whether they had identified all the incidents underlying their claims of racial discrimination, hostile work environment, and / or retaliation, as relevant to each individual plaintiff's claims.  Each plaintiff responded that they had.

Nevertheless, in opposing summary judgment, many of the plaintiffs have submitted affidavits in which they have suddenly and conveniently recalled additional incidents that support their claims.  And it is not just one or two incidents – one plaintiff, Sandra Walker, added twelve additional incidents that she argues support her hostile work environment claim.[2]

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir. 1996); see also O'Leary v. City of New York, 938 F. Supp. 2d 410, 413 n.1 (E.D.N.Y. Apr. 11, 2013); Shabazz v. Pico, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, D.J.).

A defendant in an employment discrimination case must be able to ask a witness specific questions about incidents that she recalls at her deposition, and then to close the circle on that information by asking, "are there any other incidents?"  If the party cannot rely on a negative answer to that question in making its motion for summary judgment, then its ability to move for summary judgment based on the record as developed would be unfairly compromised.  See Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an

---

[2] For the most part, these are incidents that they have learned from others, including statements recounted to them third hand by unidentified co-workers.  Such "evidence" is obviously inadmissible hearsay.

affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). It was up to plaintiffs' lawyer to prepare their witnesses for deposition so that each of their recollections would be sufficient to describe the incidents that supported each of their cases, and in the event a plaintiff suffered a lapse of memory during the deposition, to examine that plaintiff at the deposition to refresh her recollection.

Waiting until plaintiffs have read or been briefed as to defendant's summary judgment motion before they "remember" what happened is not permitted. Plaintiffs cannot testify in deposition that they have identified all of the facts underlying their claims, and then submit an affidavit in which they happen to recollect other key facts. I will not consider any facts that plaintiffs have added to their claims by affidavit in contradiction to their depositions.

## I.    Diane Worrell

Plaintiff Diane Worrell ("Worrell") is an African-American currently employed at defendant's Maspeth Production facility as a "Production Associate." She has been employed in this capacity since 2001. Worrell alleges that on the basis of her race she was discriminated against by being assigned cleanup duty, which to her was an undesirable task. Worrell also claims she was subjected to a hostile work environment.

### A.  Racial Discrimination Claims

#### 1.  Facts

Worrell claims that two of her supervisors, Kevin Masters and Andy Elhrich, racially discriminated against her by assigning her to cleanup duty. Elhrich last worked at the Maspeth facility in 2007 and Worrell has had no contact with him since 2003. Worrell has also not had

any interaction with Masters since 2003 and it is undisputed that he has not discriminated against her since then. Worrell never reported Masters to anyone about placing her on cleanup duty.

Manager Patrick Dixon testified that White Production Assistants have also performed cleanup, although Worrell says she never saw them assigned. Furthermore, any work assignments given to a Production Associate on any given day do not affect the Production Associate's title, rate of pay, or hours. Worrell states that while working at the Maspeth facility, she was assigned to work cleanup as recently as 2005, although defendant states that the last time she performed cleanup duty was in 2003. Over the past four years she has been assigned to work as a labeler operator as well as a filler operator.

2. Analysis

Worrell invokes the continuing violation doctrine in an attempt to avoid the statute of limitations as to her claim of racially discriminatory job assignments – given that the last allegedly discriminatory assignment was in 2005 (defendant argues it was 2003), the statute of limitations would otherwise have expired in 2008 at the latest. However, as noted, there is extensive case law holding that discrete discriminatory acts, separately actionable, are not subject to that doctrine. See, e.g., Morgan, 536 at 114; Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 157 (2d Cir. 2012); Thomas v. N.Y.C. Dep't of Educ., 938 F. Supp. 2d 334, 348 (E.D.N.Y. 2013). "[D]enial of preferred job assignments" is a prototypical example of a discrete act that is not subject to the continuing violation doctrine. See, e.g., Benson v. N. Shore-Long Island Jewish Health Sys., 482 F. Supp. 2d 320, 329-330 (E.D.N.Y. 2007).

Worrell's claim for discriminatory job assignments is barred even under the more liberal CHRL continuing violation doctrine. She points to no claim of a discriminatory clean up assignment that occurred after 2009 that could anchor her untimely claims within the statute of

limitations, and she has had no contact with the individuals who allegedly discriminated against her since well before 2009.

Even if not time-barred, Worrell's racial discrimination claim is substantively deficient. "[A]llegations of . . . unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment." Hubbard v. Port Auth. of N.Y. & N. J., No. 05 Civ. 4396, 2008 WL 464694, at *11 (S.D.N.Y. Feb. 20, 2008). Worrell admitted that her pay, title, and hours did not change during the alleged discrimination. Thus, there is no way to construe her assignment to less desirable tasks as an adverse employment action.

Further, when asked for evidence supporting her claim that she received these assignments because of her race, Worrell pointed only to her subjective belief that she was discriminated against. But her feelings are not evidence of discrimination. See Cajamarca v. Regal Entm't Grp., 863 F. Supp. 2d 237, 241 n.1 (E.D.N.Y. 2012) ("[F]eelings and perceptions of being discriminated against are not evidence of discrimination."). Meanwhile, defendant has specifically identified, by name, five White employees who were also assigned to clean up work. The fact that Worrell claims not to have seen these workers perform cleanup is not admissible evidence sufficient to create a disputed issue of material fact; she does not have personal knowledge sufficient to dispute defendant's evidence. Worrell has not met even the *de minimus* burden of demonstrating a *prima facie* case under the SHRL.

Neither has Worrell provided evidence that supports her claim that she was treated "less well" or that would give rise to an inference of discrimination under the CHRL. Again, the only evidence she provides is that she did not see any White workers perform cleanup and her subjective belief that her supervisors assigned her to cleanup because of her race. But an

absence of knowledge is insufficient to create a material issue of fact concerning whether she was treated less well on the basis of race; Worrell had to provide admissible evidence in support of her claim.  See Risco v. McHugh, 868 F. Supp. 2d 75, 98-99 (S.D.N.Y. 2012).  In any event, defendant had a legitimate reason to assign Worrell to cleanup:  such work was within her job description.

Because Worrell's racial discrimination claim is time-barred and substantively deficient under both statutes, summary judgment is granted to defendant.

### B.  Hostile Work Environment Claim

#### 1.  Facts

Worrell also alleges that she was subjected to a hostile work environment based on race discrimination.  Most of her evidence is from long before 2009.

Specifically, she states that co-plaintiff Sandra Walker told Worrell that coworker Steve Harris, who is White, called Walker an "aunt jemima mammy" in 2002.  Worrell heard Maintenance Supervisor Vito Cavarella, who is White, call coworker Yvette Butler a "moron" or "idiot" in 2003.  She heard Production Associate Angela Ponticello, who is White, call Butler a n----r once in 2004, but Ponticello was fired in 2006 and since then Worrell has not personally heard anyone else use the word at defendant's facility.  Coworker Phil McCauley, who is White, wore a confederate flag bandana to work one day in 2003, but he was told to remove it by Supervisor Ehlrich and a disciplinary memorandum noting this was placed in McCauley's personnel file.

Worrell also overheard Production Associate Marcello Ocello, who is White, make a comment about President Obama giving out Kentucky Fried Chicken coupons in 2008, but she never reported this to her superiors until this lawsuit.  Once this lawsuit was filed, defendant

investigated this incident found Worrell's allegation to be unsubstantiated. Finally, she was told in 2012 by Dave Vilceus that coworker Paul Bergen repeatedly used the "n" word, although she does not know when Bergen said this and he has not been employed by defendant since 2008.

Since 2009, Worrell has heard coworkers Dave Vilceus, Sandra Walker, and Franklin Auld complain about their work environment. Worrell also heard from a coworker that Production Associate Dorwyn Lewis, who is Black, threatened to blow up Sandra Walker's house, but Worrell never reported this to defendant. Worrell overheard Production Associate Joe Rosalia, who is White, ask Vilceus why he was not sitting at the "Haitian table," but never reported this either. In July 2011, someone went into the men's bathroom and saw a note stating "n----rs must die;" Worrell's co-plaintiff Vilceus told her of this, although it is not clear when he did so. In 2011, Worrell was told by co-plaintiff Guillermo Nunez that Lewis had threatened to crush his bones.

Worrell also attempts to add several additional facts to her hostile work environment claim by affidavit. Worrell was asked at her deposition whether she had identified all the offensive comments or actions of which she was aware, and stated that she had. I therefore will not consider her attempt to contradict her testimony by affidavit.

2. Analysis

Worrell again attempts to use the continuing violation doctrine to include otherwise untimely incidents in her hostile work environment claim. However, the only apparent connection between the timely and untimely incidents is that some coworkers used the word n----r before 2009, and the racist note found in the bathroom used the same vile slur. That is insufficient to demonstrate that the untimely and timely incidents were part of the same hostile work environment.

The untimely incidents include racial slurs made by a coworker, Angela Ponticello, in 2004, which Worrell overheard herself. But this was seven years prior to the note being found. It is not plausible that Ponticello's use of the word was related to a note found in a bathroom in 2011. See McGullam, 609 F.3d at 77-78 (finding that offensive comments plaintiff heard in different departments of her office a year apart were not sufficiently related to apply the continuing violation doctrine). Indeed, it is undisputed that Ponticello was fired in 2006, years before the note was found.

As for Bergen's comments, Worrell has provided no admissible evidence that they were made. Worrell states that she was told by Vilceus about Bergen's use of the slur. Vilceus did not mention Bergen's comments at his own deposition. Instead, Vilceus submitted an affidavit in opposition to summary judgment that stated, in relevant part: "I was made aware that Caucasian employee Paul Bergen used the n-word often in conversation."

This approach taken by plaintiffs is inappropriate on multiple levels. Although incidents that a plaintiff learns of second-hand may form the basis of a hostile work environment claim, a plaintiff must provide admissible evidence that the incidents actually occurred, for example by submitting an affidavit from the coworker who heard the comments. See Whidbee, 223 F.3d at 77-78. Worrell has not done so; indeed, Vilceus' conclusory assertion does not explain how he was "made aware" that Bergen used the slur, how "often" it occurred, nor anything else that would permit the Court to analyze the effect hearing about those comments (third-hand, years later) may have had on Worrell's work environment. Bergen's comments must be disregarded because plaintiffs have not provided any admissible evidence that they were made. And again, Bergen left defendant's employ in 2008, and so his comments, even if they were made, could not be related to a racist note found in 2011.

On a broader level, this is but one example of how plaintiffs have systematically supported their claims by citing to the affidavits or testimony of their co-plaintiffs. Those co-plaintiffs often testify in turn that the information was conveyed to them by yet another person, who, as here, is either unidentified or at least has not submitted an affidavit. Although though second-hand knowledge may support a hostile work environment claim, this merry-go-round of hearsay is insufficient to withstand summary judgment unless it stops, at some point, at admissible evidence.

The remainder of Worrell's claim consists of "sporadic, discriminatory actions, taken by different coworkers," which "preclude[s] invocation of the continuing violation doctrine." Maxton v. Underwriter Labs. Inc., 4 F. Supp. 3d 534, 544-45 (E.D.N.Y. 2014). The timely incidents are not sufficiently related to the untimely incidents to constitute part of the same continuing hostile work environment under either the SHRL or CHRL – they all involved different perpetrators and qualitatively different incidents, spread out over a number of years.

I will therefore consider only the incidents that allegedly occurred after 2009 in determining whether Worrell has raised a material issue of fact as to her hostile work environment claim. Considered collectively, these timely incidents are insufficient for a reasonable juror to conclude that Worrell suffered from a hostile work environment. First, complaints from Worrell's coworkers – such as Franklin Auld, Walker, and Vilceus – about how they felt about their own work environment cannot render Worrell's own work environment hostile. See Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999) ("[G]eneralized feelings of discomfort [fall] well short of the proof required to show a hostile work environment.").

Second, coworker Dorwyn Lewis's threat to co-plaintiff Guillermo Nunez about "crushing his bones" lacks any indication it was motivated by a discriminatory animus, and Worrell has not provided any evidence to the contrary besides her own conclusory belief that it was. See McWhite v. N.Y.C. Housing Auth., No. 05 CV 0991, 2008 WL 1699446, at *14 (E.D.N.Y. Apr. 10, 2008) ("Facially neutral incidents may be included in the totality of circumstances a court uses to consider a hostile work environment claim, so long as a reasonable fact finder could conclude that the incidents were based on a discriminatory or retaliatory motive."). Coworker Joe Rosalia's question to Vilceus concerning why he was not sitting at the "Haitian table," was not directed at Worrell, and in any event anti-discrimination laws "do not set forth a general civility code for the American workplace." Burlington, 548 U.S. at 68.

The racist note found in the bathroom does not render Worrell's work environment "permeated" by "severe or pervasive" racial harassment, even when combined with the incidents above. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."); Bolden v. N.Y.C. Hous. Auth., No. 96 Civ. 2835, 1997 WL 666236, at *1-2 (S.D.N.Y. Oct. 27, 1997) (holding as matter of law that the use of the "n" word together with five other racially derogatory remarks over a period of six weeks is insufficient to establish a hostile work environment claim). Although the bathroom note was certainly vile, it is a single isolated incident that bears no relation to the other incidents that Worrell claims constituted a hostile work environment. The note is in no way indicative of any pattern of harassment.

Moreover, Worrell states in her brief that she only learned of the note third-hand through Vilceus, who in turn learned of it from "management and coworkers." This raises the possibility that Vilceus – or the co-worker who told him of it – learned of the racist note through the very remedial efforts that defendant undertook after it was found. The fact that Worrell (and her co-plaintiffs) only learned of the note third-hand at least reduces the effect it could have on her work environment, even if it does not render it irrelevant; indeed, the individual who actually found the note is not a plaintiff here.

Most importantly, defendant's response to the note was remedial, prompt, and effective. If an employer becomes aware of a hostile work environment existed, it has a "duty to take reasonable steps to remedy it." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d Cir. 1998). "The standard for reviewing the appropriateness of an employer's response to co-worker harassment 'is essentially a negligence one, and reasonableness depends among other things on the gravity of the harassment alleged.'" Summa v. Hostra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (quoting Torres v. Pisano, 116 F.3d 625, 638 (2d Cir. 1997)); see also Distasio, 157 F.3d at 65 ("Whether the company's response was reasonable has to be assessed from the totality of circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment.").

Here, when the Manager Patrick Dixon was alerted to the note he called security, held meetings to stress that such a note would not be tolerated, requested that anyone with information about the note to report it, and emphasized that if an employee was found to be responsible, that employee would be fired. Dixon and Human Resources Business Partner Rima Dagia led a training course following the incident titled "Conduct in the Workplace,

Expectations for all Employees."  Security and Human Resources investigated the note by conducting interviews and viewing video footage.  Dixon also contacted the New York and New Jersey State Divisions of Human Rights.

Plaintiffs argue that the investigation was insufficient, because no one was disciplined, the investigation was "outsourced," and only two workers were interviewed.  But they do not explain how these alleged deficiencies rendered the steps that defendant took unreasonable.  Short of an unlikely admission of responsibility by the culprit, the author of the bathroom note was likely to remain anonymous regardless of the resources that defendant invested in tracking him down, particularly because it is undisputed that the note was found in a bathroom accessible to both defendants' employees and outside contractors.  It would not have been unreasonable for defendant to conclude that its remedial efforts were better spent on education and prevention of future incidents, rather than an exhaustive investigation to identify and punish the culprit.

The "outsourcing" about which plaintiffs complain, meanwhile, was to defendant's own Employee Relations Team, i.e., defendant's department tasked with such investigations.  Although located in Florida, Employee Relations sent a Security Manager Carlos Rodriguez on-site to investigate, along with Dagia to conduct additional training.  Plaintiffs do not at all explain how the "outsourcing" of the investigation affected it substantively.

Plaintiffs do not otherwise dispute the steps that defendant took after learning of the note.  These steps were a reasonable remedial effort.  Summa involved a series of sexually harassing incidents directed at the female manager of the defendant University's football team, including offensive Facebook postings, and an incident involving a sexually provocative R-rated movie played on the team bus.  The Second Circuit held that the district court properly granted summary judgment to the University where it reacted immediately to each of the plaintiff's

complaints, by requiring the players to remove the offensive posts, shutting off the movie when the plaintiff complained, and holding sexual harassment training for the coaching staff. See Summa at 125; see also Wahlstrom v. Metro-N. Commuter R.R. Co., 89 F. Supp. 2d 506, 525 (S.D.N.Y. 2000) (finding defendant took reasonable steps when it began its investigation immediately, interviewed pertinent witnesses, and gave instructions that further harassment would not be tolerated).

Here, the racist note found in the bathroom did not target any particular individual, which at least somewhat lessens its gravity. Further, defendant's response was immediate and reasonable, and there have been no subsequent incidents of a similar nature. "Because defendant . . . took the needed remedial action in this case," the racist note "cannot be imputed to" defendant. Summa, 708 F.3d at 125.

Finally, Worrell's evidence fails even under the more liberal standard of the CHRL. Those incidents not barred by the statute of limitations are either entirely unsupported by any evidence of discriminatory intent, or are mere petty slights. The only exception, the anonymous bathroom note, was promptly and effectively remediated. See Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 286 (S.D.N.Y. 2006) (granting summary judgment as to NYCHRL hostile work environment claim, where plaintiff failed to allege that her supervisors made the discriminatory comments, were or should have been aware of them, or failed to take remedial action); cf. N.Y.C. Admin. Code § 8-107(13)(b)(2) (employer liable "the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action").

Summary judgment is therefore granted to defendant as to Worrell's hostile work environment claims.

## II. Guillermo Nunez

Plaintiff Guillermo Nunez ("Nunez") has been a "Lead Clerk" at defendant's Maspeth facility since October 2002 and is Hispanic. Nunez continues to be employed there. He brings racial discrimination claims; retaliation claims; and hostile work environment claims under both the SHRL and CHRL.

### A. Racial Discrimination Claims

#### 1. Facts

In 2004, Nunez was transferred from the second-shift in Maspeth to the second-shift in Elmsford by Manager Larry Maloney, an act Nunez believes was discriminatory. A White coworker, Robert D'Amico, replaced Nunez. At the Elmsford facility Nunez was given the same position, Lead Clerk, with additional responsibilities that included planning drivers' routes and watching drivers' schedules. A few months later, he was transferred back to the Maspeth facility to work on the first-shift.

Nunez points to several occasions when he was denied a promotion. In 2005, Nunez never applied for the third-shift Warehouse Supervisor position at Maspeth. In 2006, Nunez interviewed with Operations Manager Debra Babic, who is White, and former Warehouse Manager Nelson Cabrera, who is Hispanic, for a supervisory position that concerned the ordering of raw materials and helping with inventory. However, he was advised afterwards that the position would not be filled because of a "lack of money." A White coworker named "Lucy" was later named to another position that was responsible for ordering raw materials. Although Nunez helped Lucy with this task, he never supervised her.

Nunez alleges one instance, before 2009, in which he received insufficient training before being assigned to work dispatch. Nunez received only four days of training before he was sent to

dispatch by Maloney. Other workers, who were White, received more training, ranging from 7-8 days to months. It is undisputed that the amount of training that an employee receives at defendant's facility depends on the employee's position and the speed at which the employee learns the task at hand.

Around 2008, Nunez was told that Brian Penske, a White worker, was making more money than Nunez even though he had less seniority. Defendant states that Penske was a Transportation Supervisor, a different position than Nunez held. Plaintiffs state that both Penske and Nunez were "dispatchers." Defendant states that Nunez is currently the highest paid clerk in either Maspeth or Elmsford; plaintiffs dispute that, but only state that they have not seen evidence indicating that he is.

Until 2007, Nunez was required to work on the weekends by his former Managers Maloney, Melissa Kanavan, and current Manager Gabino Roche. Nunez was told that working weekends was "imperative for [him] to keep his job." Defendant's Elmsford and Maspeth facilities operate seven days a week.

Nunez also cites several performance reviews he believes were graded unfairly. In 2006, he did not receive a rating lower than 3 out of 5. In 2007 he received an overall rating of 3.73. In 2008, he received an overall rating of "meets expectations." In 2009 he received a "meets expectations" on his review with no rating lower than 3 in any category. In 2010, he received an overall rating of "meets expectations." In 2011, he received an overall rating of "meets expectations." Nunez also received salary raises in 2009, 2010, and 2011.

In 2009, when asked to make a phone call to a manager by Supervisor Chris Harris, who is Black, Nunez refused by saying, "anybody who wants to speak to me can call me." Harris responded by saying Supervisor Joe Aemesegio, who is White, was "going to take care of [him]"

or "he's going to deal with [him] once he gets back."  Nunez claims that Aemesegio was known to be a violent person who threw things at workers.  But Aemesegio never actually talked to Nunez regarding his refusal to make the call.

On January 5, 2011, Nunez received a verbal coaching advising him to be "cooperative and professional, when dealing with his supervisors/managers."  This incident involved Babic coaching Nunez about a weather-related delay, calling him a liar, "barking orders," "badgering" him, and mentioning to another worker, "you see Joe, what I have to deal with?"  Nunez also received a written warning on January 21, 2011 for quitting his shift early ten times and being late thirty-three times in a five-month period.

## 2. Analysis

All claims that accrued before 2009 are time-barred, including Nunez' claims based on the transfer, improper training, denial-of-promotions, being forced to work weekends, disparate pay, and Nunez's performance reviews from 2006-2008.  Each of these claims is a discrete act to which the continuing violation doctrine cannot apply.  This includes his performance reviews from before 2009, even though Nunez claims that reviews that occurred since 2009 were also discriminatory.  See Dimitracopoulos v. City of New York, No. 14 Civ. 674, 2014 WL 2547586, at *7 (E.D.N.Y. June 4, 2014) (finding that each negative review was a discrete act that cannot be used for the continuing violation doctrine, even where one review was timely); Jackson v. N.Y. State Office of Mental Health, No. 11 Civ. 7832, 2012 WL 3457961, at *6 (S.D.N.Y. Aug. 3, 2012) (same); Siddiqi v. N.Y.C. Health and Hosps. Corp., 572 F. Supp. 2d 353, 366-67 (S.D.N.Y. 2008) (same).  With the exception of the performance reviews, each of these discrete untimely actions is entirely distinct from Nunez's timely claims – involving different

supervisors, different employment actions, and spread out over an extended period of time. Therefore, the more lenient CHRL continuing violation doctrine is also inapplicable.

Nunez's remaining discrimination claims are substantively deficient under both the CHRL and the SHRL. His performance reviews – both those from 2006-2008 and those from 2009-2011 – were never scored below "meets expectations." Nunez's subjective belief that he should have received higher scores is neither evidence of an adverse employment action nor that he was treated "less well" due to discrimination. See Boata v. Pfizer, Inc., No. 10 Civ. 4390, 2013 WL 432585, at *5 (S.D.N.Y. Jan. 31, 2013) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent.") (citations omitted). In fact, the terms of his employment improved during that time span, because he was given a salary increase each year. Finally, he cites no factual basis for his belief that the evaluations were prepared by White managers with a "demonstrated history" of discrimination and that White workers never received inaccurate evaluations. Plaintiffs have substantiated neither the supervisors' "demonstrated history" of discrimination, nor the accuracy of White workers' evaluations. Again, Nunez's "feelings and perceptions of being discriminated against are not evidence of discrimination." Cajamarca, 863 F. Supp. at 241 n.1.

Nunez's other discrimination claims unravel at the slightest tug. Even if a coworker threatened that Nunez's Supervisor, Joe Aemesegio, would "take care" of him, Aemesegio never took any action against Nunez. Thus, there was no adverse employment action or treatment "less well." Further, Nunez provides no admissible evidence regarding Aemesegio's supposed propensity for violence; and in any event, this purported threat is completely devoid of any racial connotation and Nunez provides no evidence that would support an inference of discriminatory intent.

The discipline that Nunez received did not constitute adverse employment actions. "Courts in this Circuit have found that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in absence of other negative results such as decrease in pay or being placed on probation. In other words, being advised and counseled does not, as a matter of law, constitute an adverse employment action." Uddin v. City of New York, 427 F. Supp. 2d 414, 429-30 (S.D.N.Y. 2006) (quotations and citations omitted). Thus, neither Debra Babic's oral coaching nor the written warnings that Nunez received qualify as adverse employment actions.

Even if the discipline he received constituted being treated "less well," Nunez has provided no evidence that would allow a reasonable fact-finder to conclude that it was motivated by discrimination. "Barking orders" and implying that Nunez is an "idiot" might be rude, but it has nothing to do with race; "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." Mihalik, 715 F.3d at 110. Nunez's speculation that Babic never yelled at White workers in such a manner is inadmissible; he has no way of knowing whether that is the case or not. The written warning is similarly entirely race-neutral, and Nunez has provided no evidence whatsoever that would permit an inference of discriminatory intent.

Finally, defendant has stated legitimate reasons for the written warning: Nunez was late to work *thirty-three* times and quit his shift early *ten* times in a five-month period. Nunez has provided no evidence that this justification for his discipline was mere pretext for a policy of racial discrimination.

All of Nunez's racial discrimination claims are either time-barred, inadequate as a matter of law, or both. Summary judgment is therefore granted to defendant.

**B. Hostile Work Environment Claim**

1. <u>Facts</u>

At some point prior to 2009, Nunez heard Manager Mike Limbaugh say the "n" word to a Hispanic worker and reported this to his Elmsford Manager, Roche. Limbaugh last worked for defendant in 2007. Between 2002 and 2007 Nunez also heard Maloney make a number of offensive racist comments in English and Spanish, including racist jokes. Melissa Kanavan, a Manager, would also make "[B]lack and Latino jokes," say Latinos were "not too smart," and referred to the "Bronx ghetto" the first two or three years Nunez worked for defendant; Kanavan stopped working at the Maspeth facility in 2005. Seven or eight years ago, Roche also asked Nunez if he was a "wetback" and said Latinos' education was "limited" during his time in Elmsford.

In 2011, Nunez complained to Human Resources that Ray Centano yelled, barked orders, and cursed at him. Around the same time Nunez claims that Babic talked to minorities in condescending tones, yelled at Nunez, and made a number of inappropriate comments of a sexual nature, including that she had a "naked Black man" in her bed.

2. <u>Analysis</u>

Like the other plaintiffs, Nunez attempts to invoke the "continuing violation" doctrine and base his hostile work environment claim on events that would otherwise be time-barred. To the extent that Nunez attempts to rely on the incidents underlying his racial discrimination claims, as discussed above, all of those incidents are discrete acts that cannot be used to apply the continuing violation doctrine. <u>See</u> <u>Morgan</u>, 536 U.S. at 113.

There is also no connection between the incidents outside and inside the limitations period. The alleged perpetrators of the pre-2009 hostile work environment incidents were Mike Limbaugh, Larry Maloney, Melissa Kanavan, and Gabino Roche. Kanavan has not worked at CCR since 2005, Limbaugh and Maloney have not worked at CCR since 2007, and Nunez cannot recall if Roche has made a discriminatory comment in the past six years. These incidents are thus qualitatively different from both Babic's comment about having a "naked Black man" in her bed and Centano yelling at Nunez and calling him an "idiot." Furthermore, the name-calling that makes up Nunez's retaliation claim has no racial connotation whatsoever and he provides no admissible evidence that would demonstrate otherwise. Therefore, the continuing violation doctrine cannot save the pre-2009 allegations, under either the SHRL or CHRL, because there is no evidence of a hostile environment that continued into the limitations period.

Nunez adds several incidents to his hostile work environment claim in his affidavit, which includes hearing about the racist note found in the bathroom. However, in his deposition he stated that he could not remember any other incidents related to his claims. Nunez's sudden recollection of events contradicts his previous testimony, and these "remembered" incidents will not be considered.

This leaves seven incidents to consider that occurred within the limitations period: Chris Harris's threat to Nunez that Aemesegio would "take care" of him when Nunez refused to make a call; Babic's verbal coaching; his performance reviews from 2009 to 2011; being called a "ringleader" and a "rat"; the Final Written Warning from 2012; Centano yelling at him; and Babic's comments about a "naked Black man."

Together, these acts do not meet the SHRL standard that the work place was "permeated with discriminatory intimidation . . . ." See Mack, 326 F.3d at 122. Indeed, the majority of these

incidents appear to have nothing to do with race, and Nunez otherwise provides no evidence that they were racially motivated beyond his conclusory assertions that they were.

The only incident that was remotely racial in context was Babic's comment concerning the "naked Black man."  While inappropriate, this comment alone does not create an environment of discrimination that is "sufficiently severe or pervasive" to create an issue of fact as to whether Nunez was subjected to a hostile work environment under the SHRL.  Neither does this comment meet the CHRL standard because the city statute is not a "general civility code." Mihalik, 715 F.3d at 113.  While even a single comment may be actionable under the CHRL, Babic's comment amounts to a "petty slight or trivial inconvenience" rather than overt "differential treatment of any degree based on a discriminatory motive."  See id.; Hernandez, 103 A.D.3d at 113.

Because Nunez has failed to show that that his work environment was "permeated" with discriminatory intimidation, and because no reasonable jury could interpret the comments he heard as more than petty slights, defendant is granted summary judgment.

### C.  Retaliation Claims

#### 1.  Facts

Nunez states that several of his coworkers, and one supervisor, called him a "rat" after he had filed this lawsuit in 2012; other coworkers gave him "dirty looks" as well.  According to Nunez, this was because defendant's counsel informed workers at the Maspeth plant that the plant would shut down due to the lawsuit, and that Nunez was a ringleader of the suit; "everybody stopped talking" to him after word about the lawsuit got out.

Nunez also received a Final Written Warning on July 10, 2012, based on an argument he got into with Dorwyn Lewis.  Nunez admits that he sang the song "Georgia On My Mind" in

Lewis's presence and may have said "hot 'lanta" to him as well, which Lewis interpreted as harassment in response to Lewis' recent attendance at a Coca-Cola shareholders meeting in Atlanta.  Lewis filed a complaint referring to these statements, and further alleged that Nunez said to him "Good lap dog. Good boy for the master."  After an investigation, defendant found Lewis' allegations substantiated, and issued Nunez a Final Written Warning for violating defendant's E.E.O. & Harassment policy.  Lewis was also disciplined for his role in the confrontation – he used profanities at Nunez in response – and received a verbal coaching.

## 2.  Analysis

Nunez's contention that being called a "rat" is an adverse employment action under the SHRL is erroneous.  Being called names in the workplace does not rise to the level of a "materially adverse" action.  Burlington, 548 U.S. at 68; see also Scott v. City of N.Y. Dep't of Corrections, 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2011) ("[V]erbal abuse is typically insufficient to constitute an adverse employment action because negative or otherwise insulting statements are hardly even actions, let alone adverse actions.") (quotations and citations omitted).  Nunez cannot meet his burden under the SHRL.

The CHRL presents a somewhat closer issue.  In applying the more liberal CHRL retaliation standard, the Second Circuit held that publicly humiliating an employee in front of her coworkers "and otherwise shunning her was likely to deter a reasonable person from opposing [defendant's] harassing behavior in the future."  Mihalik, 715 F.3d at 116; see also Johnson v. Strive East Harlem Employment Grp., 990 F. Supp. 2d 435, 449 (S.D.N.Y. 2014) (Supervisor's advice to multiple of plaintiff's coworkers to not associate with plaintiff due to her discrimination complaint adequate to support a finding of retaliation under CHRL).  The assessment of whether conduct is reasonably likely to deter a plaintiff from complaining must be

made with a "keen sense of workplace realities, of the fact that the chilling effect of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct." Mihalik, 715 F.3d at 112 (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).

Nonetheless, the scattered comments to which Nunez was subjected are insufficient to sustain a retaliation claim under the CHRL. Nunez was, at worst, spoken to rudely by a supervisor and several coworkers. "As a matter of common sense, this sort of breakdown in personal relations is inevitable once a serious lawsuit has been commenced." Melman v. Montefiore Med. Center, 98 A.D.3d 107, 131, 946 N.Y.S.2d 27 (1st Dep't 2012). The "workplace reality" is that filing a lawsuit accusing a broad swathe of coworkers and supervisors of racism is necessarily going to alienate some of those people. An employer cannot be held liable for retaliation under the CHRL merely because anyone expresses their displeasure at the lawsuit.

Petty slights like those directed at Nunez are insufficient evidence of retaliation to survive summary judgment. Even the CHRL is not a general civility code. See Mihalik, 715 F.3d at 112. Indeed, Nunez's claim that "everyone stopped talking to him" after he filed his lawsuit is belied by the evidence; he brought suit with fifteen other plaintiffs, and submitted an affidavit describing information he learned from his co-plaintiffs and other coworkers.

Nor has Nunez substantiated his hyperbolic claim that his coworker's comments were part of an "orchestrated campaign" by defendant's counsel to "demonize" him. As evidence, Nunez cites only his own deposition testimony that other co-workers, such as Steve Mercurio, told him that defendant's counsel had told them that Nunez was a "ringleader." But although the underlying comments by defendant's counsel might be admissible as party admissions, Nunez's

testimony that those comments were relayed to him through Mercurio makes them inadmissible hearsay. Nunez has not cited any testimony by witnesses with personal knowledge as to what defendant's counsel actually told Mercurio or other coworkers; given that Mercurio was deposed, the absence of such evidence is telling.[3]

As for the Final Written Warning that Nunez received in 2012, he has not provided evidence that this warning was caused by retaliatory animus. He offers no direct evidence connecting the Written Warning to this lawsuit; he simply states, in conclusory fashion, that he received the warning in "retaliation for filing his lawsuit." As for circumstantial evidence, Nunez received the warning six months after he filed his lawsuit. Although there is no bright-line rule, courts within this Circuit are hesitant to find a causal connection when the alleged retaliatory action takes place more than three months after the protected activity occurs, in the absence of other evidence of a causal nexus. See Preuss v. Kolmar Labs. Inc., 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) ("[D]istrict courts in the Circuit have held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of discrimination.") (quotations and citations omitted).

Furthermore, Nunez largely admits to the conduct underlying the Written Warning. Nunez admits that he sang "Georgia on my Mind" in the presence of Lewis, who had just returned from a Coca-Cola shareholder's meeting in Atlanta; Nunez further admits that he may have said "hot 'lanta" as well. Defendant thus has identified a legitimate, non-retaliatory justification for the discipline: Nunez apparently harassed Lewis based on his attendance at the shareholders' meeting.

---

[3] Indeed, Mercurio testified that no one had ever told him that the plant would close because of the lawsuit, contradicting one aspect of Nunez's testimony regarding what his coworkers were told by defendant's counsel.

It is of no moment that Nunez denies additionally telling Lewis "Good lap dog. Good boy for the master," although I note that defendant's investigation found that four witnesses corroborated Nunez making this statement. It is not the role of the Court to sit as a super-personnel department, and re-weigh the facts in order to determine whether discipline was justified under defendant's policies in this particular instance. Defendant's decision to discipline Nunez need not be correct; it just cannot be retaliatory. Defendant investigated this incident – which Nunez at least admits occurred, although he disputes some of the particulars – and decided that discipline was warranted. In the absence of any evidence of retaliatory intent, or that this investigation and warning were merely pretext, Nunez's retaliation claim must fail.

Because Nunez has failed to show that the comments he heard were materially adverse or reasonably likely to deter protected conduct, and because he has adduced no evidence that the warning he received was caused by retaliatory animus, defendant is granted summary judgment as to Nunez's retaliation claims.

## III.     Sandra Walker

Plaintiff Sandra Walker ("Walker") is an African-American woman who was hired as a "Merchandiser" at defendant's Maspeth facility in 1998 and was promoted to "Production Associate" in 2001. Walker's employment was terminated in June 2012.[4] She brings several racial discrimination claims as well a hostile work environment claim. Her hostile work environment claim is largely based on comments and incidents that she heard or was made aware of by coworkers, most of which have already been discussed in this opinion. She also brings a retaliation claim.

---

[4] In her brief, Walker cites her termination as an adverse employment action. However, Walker never amended her complaint to include any termination claims and is pursuing them in a separate action that is also currently pending before me, Walker v. Coca-Cola, 14 Civ. 1396. I therefore will not consider this claim here.

## A. Racial Discrimination Claims

### 1. Facts

While working for defendant, Walker preferred to be assigned to driving a 'hi-lo' for the raw materials line and considered cleanup work, the filler machine, box maker and pallet repair to be among the worst assignments.

On May 15, 2010, Walker was assigned for half the day on cleanup, requiring her to mop the borders of the plant. Walker alleges that this was not part of her job description and no White employee has ever been assigned to do this task; defendant disputes this, and provides a sworn affidavit from Manager Dixon identifying by name five White employees who have performed cleanup, one of whom submitted his own affidavit to that effect.

Walker also alleges that White employees received preferential treatment when being disciplined. In September 2010, Walker left Debra Babic, an Operations Manager, an inappropriate and hostile voicemail, and began spreading rumors about Babic having a sexual relationship with a subordinate, Blaise Lambre. Walker presented to Human Resources sexually graphic photos and texts, and falsely claimed that Babic had sent them to Lambre, who forwarded them to Walker. It is undisputed that Walker knew this was false at the time. Later that month, Walker called Manuzza a "racist S.O.B." On October 21, 2010, Walker was issued a Final Written Warning and suspension, which listed the voicemail, the gossip about Babic, and the "racist S.O.B." comment as reasons for its issuance.

### 2. Analysis

Walker's first claim concerns her assignment to mopping duty and the filler machine, which she considered undesirable. However, she does not meet her *prima facie* burden

concerning these purportedly undesirable job assignments under the SHRL. "[A]llegations of . . . unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment." Hubbard, 2008 WL 464694, at *11. Walker was never demoted, never lost benefits or material responsibilities, and the assignments never affected her compensation. In fact, the mopping assignment about which she complains took a half day, and she admitted that she was not "upset" with her filling machine assignment.

Neither does Walker meet her burden under the CHRL because she has failed to offer admissible evidence that she was treated less well than other workers on the basis of her race. See Mihalik, 715 F.3d at 111 ("The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss."); Fenner, 2013 WL 6244156, at *13. Although defendant has provided evidence that White employees received assignments to mop the facility and operate the filler machine, Walker's only "evidence" is that she never saw White employees assigned to those tasks. Walker's absence of knowledge cannot create a disputed issue of fact.

Walker's claim that she was the target of discriminatory discipline similarly fails under both statutes. Walker identifies no coworkers who are "similarly situated in all material respects" and who engaged in similar misconduct without being disciplined. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64-65 (2d Cir. 1997). It is undisputed that Walker left Babic an inappropriate voicemail, spread rumors about Babic having sexual relations with a subordinate, circulated sexually explicit photographs that Walker falsely claimed to be of Babic, and called Manuzza a "racist S.O.B." Walker's "evidence" that her discipline was discriminatory is that she does not believe White employees are punished for similar infractions.

Not surprisingly, she has failed to identify any employee outside her protected group who has engaged in similar misconduct, much less one who did so without facing discipline. The reason seems obvious: such uniquely egregious misbehavior is unusual, and unlikely to be tolerated by any employer. She argues that a co-worker named Rosalia was not disciplined for yelling and cursing at management. Unless Rosalia also spread false sexual rumors about his supervisor and, when confronted by management about those rumors, presented explicit photographs which he falsely claimed were of that supervisor, he is not a suitable comparator. Needless to say, plaintiffs have provided no such evidence. Thus, there is no evidence of disparate treatment under defendant's disciplinary policy, and Walker has failed to establish a *prima facie* case under either the SHRL or CHRL.

Finally, even if Walker had established a *prima facie* case, her flagrant misconduct provides a non-discriminatory reason for her discipline which goes far beyond merely "legitimate." Plaintiffs, in turn, have failed to adduce any evidence of pretext.

Defendants are granted summary judgment as to Walker's racial discrimination claims.

### B. Retaliation Claims

1. <u>Facts</u>

Two months after Walker called Manuzza a "racist S.O.B.," Walker states that she experienced discriminatory and retaliatory behavior by her coworkers and supervisors. She states that Manuzza "harassed her with unfavorable assignments and increased scrutiny," namely assigning her to the filler machine and timing her breaks. Tom Metzger, a coworker, also told Walker that management wanted her "hide on the wall" after she made her "racist S.O.B." comment to Manuzza.

In September 2011, Walker filed a claim with the U.S. Equal Employment Opportunity Commission.  One month later, Babic yelled at Walker for not wearing a hairnet.  In 2012, Walker was told by her co-plaintiff Worrell that Metzger said he wanted to throw everyone on "Line Four" into a water tank to see if they could swim.  Walker was working on Line Four at the time and she reported the comment to Human Resources.

## 2.  Analysis

As a threshold matter, calling a supervisor a "racist S.O.B." is not a "protected activity." See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("[T]he way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation."); Buchanan v. Hilton Garden Inn of Westbury, No. 06 CV 3085, 2008 WL 858986, at *12 (E.D.N.Y. Mar. 31, 2008) ("[P]laintiff's 'informal' complaints were accusatory, confrontational, and insubordinate. . . . Defendant had a formal process for filing a discrimination complaint, which plaintiff did not follow.").  Thus, the first "protected activity" in which Walker engaged was her filing a claim with the EEOC in September 2011.  Any retaliation claims from before that time – which appears to be all of them except the hairnet and water tank incidents – fail as a matter of law.

The claims of retaliation that predated Walker's EEOC complaint would fail in any event. Metzger's alleged comment that management wanted Walker's "hide on the wall" is entitled to no weight in deciding this summary judgment motion, because it is inadmissible.  Plaintiffs do not offer any testimony from Metzger that management in fact made this statement; Walker's testimony about what Metzger told her that management told him is the very definition of hearsay.

As for Walker's claims of unfair job assignments and timed breaks, neither are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57. A reasonable worker would not be dissuaded from making a complaint because they she might be assigned to a position within their job description, particularly given that Walker admits she was not "upset" about the assignment. Neither does Walker have a claim for the job assignment under the CHRL because this kind of "harassment" is a mere "petty slight[ ] or trivial inconvenience[ ]." See Mihalik, 715 F.3d at 113. This same reasoning also applies to the timing of her breaks for both statutes: having one's breaks timed, with no disciplinary consequences, would not dissuade a reasonable worker from engaging in protected activity.

Nor has Walker adduced any evidence that these purportedly adverse actions were motivated by retaliatory animus. Walker admits that she was not singled out by her assignment to the filler machine, because White workers received the same assignment. She further admits that defendant had a non-retaliatory reason for moving her there, because her co-workers (including Black co-workers) complained about her and requested that she be moved. As for her breaks being timed, it is undisputed that Manuzza also timed the breaks of other associates who never complained about discrimination.

That leaves only Walker's claim that, one month after she filed her EEOC claim, she was yelled at for not wearing a hairnet, and that several months later Metzger made the water tank statement. Neither is sufficient to sustain a claim for retaliation. Plaintiffs have adduced absolutely no evidence that Metzger's comment was motivated by retaliatory animus: Worrell, who actually overheard the comment, admitted that she didn't even know who Metzger was referring to.

As for the hairnet comment, there is a rule in place for all Production Associates to wear hairnets on the production floor. A reasonable worker would not be dissuaded from engaging in protected activity because she was "yelled at" for violating a rule to which she should have adhered in the first place. Furthermore, Walker's failure to wear a hairnet is a legitimate, non-retaliatory reason for the coaching, and Walker has not provided any evidence that enforcing this rule was mere pretext for retaliation.

Summary judgment is granted to defendant as to Walker's retaliation claims.

### C. Hostile Work Environment Claim

#### 1. Facts

Walker incorporates the "water tank" incident from her retaliation claim into her hostile work environment claim. She also alleges that Dorwyn Lewis, who is Black, commented that African-American women "eat slavery food" and that they are not capable of washing themselves. Finally, although Walker was on an eleven-month leave from December 2010 to November 2011, she was found out about the racist note found in the men's bathroom through management and coworkers.

Walker adds a dozen additional allegations by affidavit attached to her Opposition to summary judgment. In her deposition, despite testifying that she had identified all the incidents supporting her claim, she mentioned only the three incidents listed above. Therefore, these incidents are the only incidents I will consider.

#### 2. Analysis

Walker cannot maintain a hostile work environment claim based on the men's room note because, as discussed above, defendant took reasonable remedial steps following its discovery and liability thus cannot be imputed to defendant.

Walker's hostile work environment claim therefore rests entirely on the two comments described above. Although crude, these two comments are too scattered and are not severe enough amount to anything more than "petty slights or trivial inconveniences." Mihalik, 715 F.3d at 113; see also Fullwood v. Assc. for the Help of Retarded Children, Inc., No. 08 Civ. 6739, 2010 WL 3910429, at *8-9 (S.D.N.Y. Sept. 28, 2010) (finding that racial comments made on four occasions over two years to be mere petty slights under CHRL).

Walker has failed to meet her *prima facie* burden for a hostile work environment claim under either statute.

## IV. Dave Vilceus

Plaintiff Dave Vilceus ("Vilceus") is a Haitian-American who has worked as a "Production Associate" at defendant's Maspeth facility since 1995. He brings racial discrimination claims based on inadequate training, discriminatory job assignments, and unwarranted discipline. He also brings a hostile work environment claim.

### A. Racial Discrimination Claims

#### 1. Facts

From 2004 to 2007, Vilceus alleges that he was denied training on the "favorable" filler machine, while White workers were given such training. On March 29, 2005, he was disciplined for taking a long break and received a Final Written Warning. In 2007, Vilceus was disciplined for not cleaning bottles that were left on the floor from a previous shift. In 2010, Vilceus was trained on a labeling machine, but he claims that minorities received less training than White workers did. In June 2011, Vilceus returned to work from a shoulder injury and was assigned to pallet repair, an assignment he believes is strenuous and degrading. He claims that White

employees that return from injuries are assigned less strenuous jobs.  On September 16, 2011 Vilceus was coached for failing to properly clean a filler machine.

2.  Analysis

All of Vilceus' claims for denial of training, unfair job assignments, and unwarranted discipline that occurred before 2009 are time-barred.  These are classic examples of "discrete acts" that are "separately actionable," and to which the continuing violation doctrine does not apply.  See Morgan, 536 U.S. at 101.  The more liberal CHRL continuing violation doctrine is similarly inapplicable; the untimely incidents about which Vilceus complains are dissimilar and disconnected from the timely ones, and all of these incidents were allegedly perpetrated by different individuals years apart.

Vilceus's timely claims are substantively deficient under both the SHRL and the CHRL. Like the other plaintiffs, Vilceus has provided no evidence that race played any role in the actions about which he complains.  For example, as to his not receiving training on a labelling machine in 2010, Vilceus simply states that he requested to be trained, was denied the opportunity by Manuzza, and believes that this denial was on the basis of his race.  As I have noted throughout this opinion, a plaintiff's subjective belief that he has been discriminated against is insufficient to create an inference of discrimination.

Vilceus's claim that he was assigned to pallet repair despite his shoulder injury also fails. Under the SHRL, "allegations of . . . unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment."  Hubbard, 2008 WL 464694, at *11.  Assignment to pallet repair at defendant's facility does not affect the worker's compensation, title, or hours; it is thus not an actionable adverse employment action.

Here again Vilceus has failed to provide any evidence of racial discrimination beyond his own subjective beliefs. Although he alleges that he was assigned to pallet repair after returning from a shoulder injury and that White workers never had to perform such assignments after injury, Vilceus has failed to provide any information about the seriousness of other White workers' injuries or whether they requested medical accommodation. Vilceus has not provided a suitable comparator who is "similarly situated in all material respects" that would permit an inference of discrimination under either the SHRL or CHRL. <u>Shumway</u>, 118 F.3d at 64.

Finally, his claim for unwarranted discipline for not cleaning a filler machine fails because oral and written warnings are not adverse employment actions absent the loss of material benefits. <u>See</u> <u>Uddin</u>, 427 F. Supp. 2d at 429. Vilceus has pointed to no evidence that his wages or conditions of employment were affected by the Final Written Warning he received.

Furthermore, Vilceus once more provides no evidence that gives rise to an inference of discrimination. In his deposition, Vilceus merely stated that he believed that when machines malfunction, White workers are not disciplined. He does not identify any incidents in which machines malfunctioned, nor does he identify the White workers who allegedly were not disciplined when that occurred. Instead, the only evidence that he provides is the conclusory statement in his deposition that "believe me, they said [to White workers whose machines malfunction], it's okay." But Vilceus admits that management doesn't inform him who is written up, and that he has no way of knowing who is and is not disciplined; his speculation is inadmissible.

Vilceus has provided no evidence that would give rise to an inference of discrimination under either the SHRL or CHRL, and defendant is therefore granted summary judgment as to Vilceus's racial discrimination claims.

### B. Hostile Work Environment Claim

#### 1. Facts

Vilceus bases his hostile work environment claim on a number of facts that have already been mentioned in this opinion. He personally witnessed a coworker wearing a confederate flag bandana to work in 2004 and another coworker making a comment about president Obama giving out Kentucky Fried Chicken in 2008. In 2005, Limbaugh forced Vilceus to shovel snow, an assignment that was allegedly outside his job description. Vilceus also states that he heard from his co-workers about other incidents already described in this opinion, including Ponticello using racial slurs in 2004.

Further, in 2011, Manuzza said to Vilceus "you guys, you should go back to grammar school and learn basic stuff" after a machine broke. On November 19, 2011, Vilceus was moved to different assignments several times during his shift; he felt that he was the only person who was forced to move around from assignment to assignment in this manner, although he admitted that he considered each of the assignments to be good jobs.

Each of the incidents cited above was mentioned in paragraphs 116 – 138 of the Complaint. At his deposition, Vilceus was asked whether paragraphs 116 – 138 of the Complaint detailed all the ways in which he was harassed. He said that they did, and further confirmed that he had identified in his testimony all of the incidents underlying his discrimination and hostile work environment claims.

In opposition to summary judgment, however, Vilceus has submitted an affidavit in which he cites numerous additional incidents – including, for example, that at one point in 2011 Vilceus was asked by coworker Joe Roaslia why he was not sitting at the "Haitian table," and that he learned of the racist note in the bathroom. For the reasons stated *supra*, I will not

consider any of the facts that Vilceus has now "recalled" for the purposes of opposing summary judgment but failed to testify about at his deposition even when he was expressly asked.

## 2. Analysis

Vilceus has failed to show that the acts that happened outside the limitations period are sufficiently related to those within it in order to utilize the continuing violation doctrine. Ponticello's use of the "n" word in 2004 is too dissimilar and far removed from any of the incidents in 2011 for both to be considered part of the same, continuing hostile work environment. The other incidents Vilceus cites, such as a coworker wearing a confederate flag bandana, Ocello's KFC comment, and Limbaugh giving Vilceus assignments purportedly outside his job description, similarly consist of "sporadic, discriminatory actions, taken by different co-workers [that] preclude invocation of the continuing violation doctrine." See Maxton, 2014 WL 1017062, at *8.

That leaves two incidents to consider: (1) Manuzza telling Vilceus to "go back to grammar school and learn basic stuff" and (2) Vilceus being moved several times from his position, allegedly to accommodate White workers with less seniority.

Together, these incidents are not enough to sustain a hostile work environment claim under either statute. Manuzza's comment was perhaps rude, but it was completely devoid of any racial connotation, and again, neither the SHRL nor the CHRL is "a general civility code." Mihalik, 715 F.3d at 113. Vilceus' conclusory statement that he has never heard of a White worker being insulted in this manner is not sufficient to create a disputed issue of material fact as to discriminatory intent.

As to being "moved back and forth" to different assignments, purportedly due to his race, Vilceus admits that he considered the jobs to which he was moved to be "good" jobs. The

Complaint alleges that each time he was replaced by a worker with less seniority, and that he complained to his union representative, who told him that the supervisor enjoyed moving Black workers around but did not do so for White workers. But, in opposing summary judgment, the only support Vilceus provides for these allegations is citation to the Complaint itself.

Allegations are not evidence. Surviving summary judgment requires the latter, and Vilceus has provided none. He has not identified the workers who replaced him, much less provided their testimony. He does not offer any testimony from the union representative. Indeed, it appears that Vilceus did not even mention this conversation with his union representative in his deposition, although even if he had, Vilceus' recounting of what the union representative told him would be inadmissible hearsay.

Defendant is granted summary judgment as to Vilceus's hostile work environment claim.

## V.    Kishia Bright

Plaintiff Kishia Bright ("Bright") is an African-American who currently holds the title of "Inventory Counter" at defendant's Maspeth facility. She brings racial discrimination and hostile work environment claims.

The parties have stipulated that any claims based on any alleged incidents that occurred on or before April 24, 2012 are dismissed with prejudice. Docket No. 34.

### A.  Racial Discrimination and Hostile Work Environment Claims

#### 1.  Facts

Bright asserts that "sometime" in 2012 Babic asked security guards for logbooks containing her attendance records. The same year Bright claims that she was denied keys to a particular supply closet that she needed to access in order to perform her job.

As for her hostile work environment claim, Bright states by affidavit that she was informed of, but never personally heard or witnessed, several incidents described above that occurred at the Maspeth facility before 2012.

## 2. Analysis

Bright's racial discrimination and hostile work environment claims are time-barred. The parties have stipulated that she cannot base her claims on any alleged incidents that occurred on or before April 24, 2012. Yet Bright's hostile work environment claim is entirely based on pre-2012 incidents. Plaintiffs provide no argument for this baffling waste of both the Court's and defendant's time and resources.

Bright also argues that she avoids this stipulation for her two racial discrimination claims because the attendance records incident occurred "in 2012" and the keys-related incident took place "a few months before Bright's November 6, 2012 testimony." Even assuming that both these events took place after April 24, I would grant summary judgment to defendant.

Bright has provided no admissible evidence for her claim regarding the attendance log. She has not identified the security guards who allegedly informed her that Babic requested the logbook containing her attendance records, much less obtained their testimony; there is thus no admissible evidence that Babic in fact did so. Bright's testimony as to what the unidentified security guards were told by Babic is rank hearsay. Indeed, defendant maintains that the "attendance logbook" does not even exist, and plaintiffs have adduced no admissible evidence to the contrary. In any event, I cannot see how Babic's asking to see this possibly-non-existent logbook constitutes racial harassment; Bright says that it was, but provides no evidence.

As for Bright's claim that she was denied keys, Bright stated in her deposition that she is able to get any supplies she needs to do her job without keys. She later filed an affidavit in

which she conveniently remembered that she does, in fact, need keys to do her job. Again, an affidavit that contradicts deposition testimony cannot create a disputed issue of fact to oppose a summary judgment.

Summary judgment is granted for defendant as to Bright's racial discrimination and hostile work environment claims.

## VI. Isaac Olabanjo

Plaintiff Isaac Olabanjo ("Olabanjo") is an African-American currently working at defendant's Maspeth facility as a "Production Associate." He asserts that due to racial discrimination he was passed over for a promotion five times from 2001-2011: (1) in 2001, for a Production Associate position; (2) in 2006, for a Quality Control position; (3) in 2009, for a Warehouse Checker position; (4) in 2010, for a Part-Time Inventory Counter position; and (5) in 2012, for a Back-Up Inventory Counter position.

### A. Racial Discrimination Claims

1. <u>Facts</u>

Olabanjo alleges that he was not promoted to Production Associate in February 2001. Later in 2001 he was, in fact, promoted to Production Associate, the position that he holds today. He also claims that he was denied a promotion in 2006 for a Quality Control position. However, it is undisputed that Olabanjo never actually applied for this position; he had merely indicated to his union representative that he was interested in it.

In 2009, Olabanjo was denied a promotion for a Warehouse Checker position in favor of a coworker with ten years more seniority. In 2010, Olabanjo was not promoted to a Backup Inventory Counter position. That position required Olabanjo to pass a qualification test. Although two managers testified that he failed this test, Olabanjo disputes this because he claims

he was never provided a copy of the test and thus claims not to know whether he had, in fact, failed it.  The position was awarded to someone who had passed the qualifying test.  There was also an opening for a Back-Up Inventory Counter position in 2012, but Olabanjo never applied.

2.  <u>Analysis</u>

All claims that accrued before 2009 are time-barred.  Although Olabanjo argues that the three claims within the limitations period provide an anchor for the earlier claims, a denial-of-promotion claim is a prototypical example of a discrete discriminatory act that cannot be subject to the continuing violation doctrine.  <u>See</u> <u>Morgan</u>, 536 U.S. at 114; <u>Chin</u>, 685 F.3d at 157; <u>Thomas</u>, 938 F. Supp. 2d at 348.  This is equally true under the more lenient CHRL standard, because  each of Olabanjo's denials of promotion occurred on unique facts:  in 2006, Olabanjo didn't actually apply for the position, and was "passed over" in favor of two Black employees; in 2009, meanwhile, he was passed over in favor of a White coworker with ten years seniority over him.  The only commonality between these incidents is that Olabanjo was not promoted; there is no pattern or practice of discrimination that could invoke the continuing violation doctrine.

Olabanjo's remaining denial-of-promotion claims are substantively deficient under both the SHRL and the CHRL.  He has failed to offer any evidence that he was qualified for the Warehouse Checker position he applied for in 2009.  Further, the worker who ended up taking this position was not similarly situated in all respects because the parties agree that he had *ten years* more seniority than Olabanjo.  <u>See</u> <u>Shumway</u>, 118 F.3d at 64.  Plaintiffs have thus failed to provide any admissible evidence of discriminatory intent.

In addition, Olabanjo has failed to provide admissible evidence that he was qualified for the Inventory Counter position he applied for in 2010.  An applicant is qualified for a position if he meets the specific criteria required by the employer. <u>See</u> <u>Thornley</u>, 104 F.3d at 29.  Defendant

requires all employees to pass a qualifying test for the position and two managers informed Olabanjo that he had failed the test.

Olabanjo believes that there is a disputed issue of fact regarding whether he failed the test because he does not know whether or not he passed; he argues that defendant never produced a copy of the test results in discovery. Olabanjo never raised this discovery dispute until now, and thus has waived it. Olabanjo's lack of personal knowledge is not evidence, and it cannot show a disputed issue of fact in light of the sworn testimony of two of defendant's managers that Olabanjo failed the test. See Risco, 868 F. Supp. 2d at 99. It is undisputed that the worker hired instead of Olabanjo passed the test. Therefore, Olabanjo has failed to provide a similarly situated comparator that might permit an inference of discrimination. See Shumway, 118 F.3d at 64. Olabanjo has not shown there is a disputed issue of fact that he qualified for the position or that the circumstances gave rise to an inference of discrimination.

Olabanjo also briefly refers to defendant's failure to promote him to a Back-Up Inventory position in 2012, but this claim fails because he admits that he did not even apply for the position. Instead, he states that he was "humiliated and dejected" by his previous denials of promotion and thus did not apply for the position. "The law is well-settled that to establish a *prima facie* case for a failure-to-hire claim, a plaintiff must show that '[he] applied for an available position for which [he] was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.'" Peretti v. Bank, No. 11 Civ. 3925, 2012 WL 2458137, at *5 (E.D.N.Y. June 27, 2012) (quoting Brown v. Coach Stores, 163 F.3d 706, 710 (2d Cir. 1998)).

Defendant is granted summary judgment as to Olabanjo's racial discrimination claims.

## VII.   Johnny Small

Plaintiff Johnny Small ("Small") is an African-American who currently works at defendant's Maspeth facility as a "Production Associate."  He brings racial discrimination claims based on denied promotions, unfavorable assignments, and unfair disciplinary action.  He also alleges that he was subjected to a hostile work environment.

### A.  Racial Discrimination Claims

#### 1.  Facts

Between 1999 and 2004, Small applied four times for promotion to his current position; he was denied until he received the promotion in 2004.  Small asserts that he was assigned the least desirable assignments.  He gives one specific example from 2007, when he was instructed by a White Supervisor to clean up after a White employee, and testifies more generally that he was unfairly assigned to cleanup, pallet repair, and recycling.  Small admits that White workers also did these kinds of assignments "every day for years."

In 2008, Small was disciplined when pallets fell off a "hi-lo" machine he was working on.  Small received counseling in 2010 for taking an excessive break and was questioned by Manuzza about taking an excessive break as well.  Defendant has counseled and disciplined White workers for excessive breaks during the same period.  Small also received a counseling from Babic in 2010 when he placed the wrong bottles on a production line, but this was subsequently marked "null and void."

#### 2.  Analysis

All of Small's discrimination claims that accrued prior to 2009, namely his claims for denial of promotion and unfavorable work assignments, are time-barred.  Although Small argues

that he received unwarranted disciplinary actions that continued into the limitations period, each one is a discrete, separately actionable claim that cannot fall within the continuing violation doctrine. See Morgan, 536 U.S. at 113. Each claim is also too distinct and unrelated to invoke even the more liberal CHRL doctrine.

Small's timely claims are substantively deficient. As I have made clear throughout this opinion, undesirable job assignments without a corresponding change in material benefits or title cannot amount to an adverse employment action. See Hubbard, 2008 WL 464694, at *11. Furthermore, Small has provided no evidence that the job assignments he received were motivated by any discriminatory animus. Small admits that White workers have done the job assignments he complains about "every day for years." He further testified at his deposition that some of these jobs were "desirable," and that "[n]one of the jobs [are] really undesirable." His subsequent affidavit contradicting this testimony will be disregarded.

The disciplinary write-ups he received in 2010 for excessive break-time and placing the wrong bottles on a production line were not adverse employment actions because he never lost any material benefits as a result. See Uddin, 427 F. Supp. 2d at 429. Defendant has also submitted documentary evidence that White workers Steve Mercurio and Bobby Dowd were counseled and disciplined for taking excessive breaks. These were two of the employees that Small identified as comparators who had *not* been disciplined for taking excessive breaks. Small thus has failed to identify a similarly situated employee who was not disciplined for excessive break time, and therefore has failed to raise a disputed issue of material fact as to discriminatory intent.

Additionally, it is undisputed that that the bottle-placement warning Small received is now marked as "null and void." In effect, Small never received the warning. There is thus no

basis on which a reasonable juror could find an adverse employment action or that Small was treated less well than his coworkers due to his race. Therefore, there are no disputed issues of fact as to either Small's SHRL or CHRL discrimination claims, and summary judgment is granted to defendant.

### B. Hostile Work Environment Claim

#### 1. Facts

At his deposition, Small testified as to three incidents involving inappropriate comments. First, in 2008, Small asked his manager Manny Serrano if he could leave because he was ill. Serrano stated that he would have to shut down the production line, and eventually replied "[g]o, go. Payback's a bitch." Second, in 2011, after Small told Serrano he needed to go to lunch, Serrano pulled down his zipper and said "I got your lunch right here." Third, Small states that he heard Dorwyn Lewis make a comment about blowing up Sandra Walker's house, although Small took that comment as a joke. At his deposition, Small was asked whether he had testified as to all of the incidents that supported his claims against defendant; Small stated that he had.

Nevertheless, in opposing summary judgment, Small submits an affidavit that adds an additional *nine* incidents to his hostile work environment claim. I once again decline to consider evidence proffered through an affidavit that contradicts the plaintiff's deposition testimony.

#### 2. Analysis

Even assuming that the 2008 incident involving Serrano can be considered as part of the same hostile work environment as the comments that Serrano made in 2011, these two incidents, combined with Lewis' comment regarding blowing up Sandra Walker's house, cannot establish a hostile work environment.

None of the comments have any overt racial connotation. Small has not provided any evidentiary basis for inferring that these facially neutral comments were in fact discriminatory. And even if racially hostile intent was somehow read into them, these comments are too scattered and infrequent to create a hostile work environment under either the SHRL or CHRL. At worst, they are petty slights and trivial inconveniences.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment as to each of the remaining plaintiffs is granted. The Clerk is directed to enter judgment, dismissing the complaint.

**SO ORDERED.**

_____
                                                              U.S.D.J.

Dated: Brooklyn, New York
          November 3, 2014